CREAM OF WHEAT CO. v. ARTHUR H. CRIST CO.

(Supreme Court, Appellate Division, Third Department.   March 18, 1915.)

1. CONTRACTS ⊚⟹147—CONSTRUCTION—INTENT OF PARTIES.

In the construction of contracts, the first and main rule is that the intent of the parties is to govern, and greater regard should be had to the question of intent than to the literal meaning of any particular words.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. ⊚⟹147.]

2. CONTRACTS ⊚⟹152—CONSTRUCTION—MEANING OF LANGUAGE USED.

The words used in a contract are generally to be taken in their ordinary and popular sense as applied to the subject-matter of the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 732, 733, 738; Dec. Dig. ⊚⟹152.]

3. CONTRACTS ⊚⟹147—CONSTRUCTION AS A WHOLE.

The intention of the parties to a contract is to be gathered from the whole instrument, and not from any detached part of it.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. ⊚⟹147.]

4. CONTRACTS ⊚⟹169—CONSTRUCTION—AMBIGUITY.

When the meaning of a contract is not clear, regard should be had to the nature of the instrument and the language used by the parties, as applicable to the subject-matter, and especially to the objects which the parties had in view.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 752; Dec. Dig. ⊚⟹169.]

5. CUSTOMS AND USAGES ⊚⟹15—CONSTRUCTION OF CONTRACT—PAROL EVIDENCE.

Where the words or the terms of a contract are not clear and explicit on the face of the instrument, or are made obscure by proof of extrinsic circumstances leaving a doubt as to their meaning, interpretation, or application to the subject-matter, evidence of custom and usage is admissible to explain such meaning or application.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 30–33; Dec. Dig. ⊚⟹15.]

6. EVIDENCE ⊚⟹456—PAROL EVIDENCE—MEANING OF LANGUAGE USED.

Where, in reference to the subject-matter of a contract, particular words and expressions have by usage and custom acquired a meaning different from their plain, ordinary, or popular meaning, the parties must be taken to have used such words in their peculiar sense, and parol evidence is competent to prove their peculiar meaning, though the words in their ordinary meaning are unambiguous.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2105, 2106; Dec. Dig. ⊚⟹456.]

---

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. CONTRACTS ☞204—ADVERTISING CONTRACTS—CONSTRUCTION—"CIRCULA-TION"—"PAID SUBSCRIBERS."

    An advertising contract provided for a rebate to the advertiser if the circulation of the other party's magazine should be found to be materially less than 63,000 copies, and defined "circulation" as including the total number of copies published, sold, and delivered to paid subscribers and news agencies, exclusive of all returns from news agencies and copies given away in any manner whatsoever, where by the established custom of the trade the term "paid subscriber" included, not only those whose subscriptions had been prepaid, but subscribers to whom the paper was sent, and who had once paid, though the subscription had not been prepaid for the years in question. *Held*, that the advertiser was not entitled to have deducted, in ascertaining the circulation, copies sent to subscribers who had not paid for several years, especially where the magazine was only sent upon the written request of the subscriber, renewed each year, upon which there was a legal liability to pay, and it was the custom to give away copies to employés, advertisers, etc., which copies were apparently those intended to be excluded, and the advertiser's general manager, who negotiated and signed the contract, while the contract was in force, was upon the circulation committee of an association of advertisers, which committee, in determining the circulation of certain newspapers, included as paid subscribers those who had once paid and to whom the paper was being sent, though no subscription had been paid for years.

    [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 916; Dec. Dig. ☞204.]

Woodward, J., dissenting.

## Appeal from Judgment on Report of Referee.

Action by the Cream of Wheat Company against the Arthur H. Crist Company. From a judgment on the report of a referee dismissing plaintiff's complaint, it appeals. Affirmed.

The opinion of the trial judge, who failed to render a decision until after the expiration of his term as Justice of the Supreme Court, and to whom the case was thereafter referred as referee, was as follows:

This controversy arises over the proper construction to be given to a contract executed by the parties. The plaintiff is a manufacturer and vendor of a cereal called "Cream of Wheat." The defendant is the proprietor and publisher of a monthly magazine called "American Motherhood." On the 7th day of August, 1911, the parties entered into a written contract by which the defendant agreed to insert in the magazine, in each of its 12 issues during the year 1912, an advertisement of plaintiff's product, for which plaintiff agreed to pay $60 per page.

The contract also contained the following provisions: "The party of the first part [the defendant] does hereby guarantee that the average circulation of the above-named publication shall not be less than sixty-three thousand (63,000) copies per issue for the time during which the above advertisement shall run, and it is understood and agreed that the term 'circulation,' for the purposes above mentioned, shall be construed as follows: The total number of copies of each issue of the publication above mentioned which shall be published and sold and delivered by the publishers thereof, both to paid subscribers and to news agencies, exclusive of all returns from news agencies and copies given away in any manner whatsoever."

The contract further provided that the plaintiff might examine the defendant's books to ascertain the extent of the magazine's circulation, and "that in case said examination or examinations do not bear out the circulation claimed and embodied in said contract, and shall be found to have averaged materially less than sixty-three thousand (63,000) copies per issue * * * the expense of this examination shall be borne by the said Arthur H. Crist Company, otherwise by the said Cream of Wheat Company; * * * that in

case said examination shows the circulation to be materially less than above stated the Arthur H. Crist Company will make a pro rata rebate to the said Cream of Wheat Company for such shortage in circulation."

The magazine was published, and the advertisement was inserted and published in each monthly issue, during the year 1912, as contemplated by the contract. In May and June, 1913, one John C. Rink, at the request of the plaintiff, examined the books and papers of the defendant, with a view of ascertaining whether the average circulation was equal to or "materially less" than the 63,000 guaranteed by the contract. The plaintiff claims that such examination shows the circulation to have been materially less than 63,000, and brings this action to recover the expense of such examination and a pro rata rebate of the amount paid for the advertisement, basing the claim upon the report and evidence of said Rink as to the average number of "paid subscribers" to the magazine during the year 1912.

It is the plaintiff's contention that the words "paid subscribers" in this contract should be construed as covering only those subscribers who had paid in advance for the year 1912, or for that portion of the year for which they should be counted, and under the evidence in this case the plaintiff would not be entitled to recover unless a proper construction would exclude all subscribers who had not paid the subscription for 1912 prior to or at some time during that year, or at any rate before June, 1913. The proofs are insufficient to warrant a finding in plaintiff's favor upon any other construction. The defendant claims that the words last quoted should include all genuine subscribers who received the magazine during 1912 and became legally obligated to pay for it for that year, and excluding those who received the magazine gratuitously or by way of exchanges, without incurring any obligation to pay for it.

It seems to me that, in view of the situation of the parties, the subject-matter of the contract, the object and purpose of the advertisement, and the benefit to be derived by the plaintiff therefrom, also the custom of advertisers and publishers, as disclosed by the evidence, that the contention of the defendant, perhaps with some limitation or change, is the more reasonable construction. The parties attempt, in their contract, to agree upon a construction for the term "circulation," and say it shall be construed to include "the total number of copies * * * published, sold, and delivered * * * to paid subscribers * * * *exclusive of all* * * * *copies given away in any manner whatsoever.*" Their words, defining the copies distributed that should be excluded from the circulation—that is, "copies given away in any manner whatsoever"—lend probability to the claim that it was not intended to exclude a subscriber who had received the magazine during 1912 and became indebted to the defendant therefor simply because he had not paid in advance.

[1–3] In the construction of contracts, the first and main rule is that the intent of the parties is to govern, and greater regard should be had to the question of intent than to the literal meaning of any particular words; and generally the words used are to be taken in their ordinary and popular sense, as applied to the subject of the contract. This intention is to be gathered from the whole instrument, and not from any detached part of it.

[4] If the meaning is not clear, regard should be had to the nature of the instrument, the language used by the parties as applicable to the subject-matter, and especially to the objects which the parties had in view.

These general rules, aided by the custom clearly established by the evidence in respect to auditing a publishers' circulation, and which custom was known to the parties, seem to warrant a construction in accordance with the defendant's contention.

[5, 6] It is well settled that where the words or the terms of a contract are not clear and explicit on the face of the instrument, or are made obscure by proof of extrinsic circumstances, leaving a doubt as to their meaning, interpretation, or application to the subject-matter, evidence of custom and usage is admissible to explain such meaning or application; also if, in reference to the subject-matter of a contract, particular words and expressions have by usage and custom acquired a meaning different from their plain, ordinary, or popular meaning, the parties using those words in their contract must be

taken to have used them in their peculiar sense, and parol evidence is competent to prove their peculiar meaning, even though the words in their ordinary meaning are unambiguous. 12 Cyc. 1081–1086.

The testimony respecting the custom and usage prevailing in such cases is substantially without dispute, and clearly establishes that it was the custom between advertisers and publishers, in seeking to ascertain the number of subscribers to a magazine for advertising purposes, to divide them into two classes, viz., "paid subscribers" and "unpaid subscribers," and that in the paid class this custom included paying subscribers—i. e., those obligated to pay, as distinguished from those who received the publication gratuitously— even though such paying subscribers had not paid in advance, or had not paid at the time of the audit or count, for the particular time covered by the advertisement.

Within this rule the evidence does not disclose, with a degree of certainty sufficient to warrant a finding, the number of "paid subscribers," except that it may be safely determined that the number was not "materially less than 63,000," which is the basis of the plaintiff's case.

In reaching the conclusion that the words "paid subscribers" in this contract should be construed as I have herein indicated, I am reminded of an English case (Gether v. Capper, 15 Common Bench Reports, 701, 702; s. c., 29 Eng. Law and Eq. 242), wherein the contract provided that the owner of a vessel should receive for carrying specified freight the highest price which he could prove to have been *paid* to other ships for the same voyage, and it was held the word "paid" was satisfied by proof of contracts to pay and by proof of what other shippers had become contractually obligated to pay.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Rogers, Locke & Babcock, of Buffalo (Evan Hollister, of Buffalo, of counsel), for appellant.

Arnold & Cooke, of Cooperstown (Lynn J. Arnold, of Cooperstown, of counsel), for respondent.

SMITH, P. J. [7] These judgments might well be affirmed upon the opinion of the learned trial judge. To this opinion we have only a few considerations to add. Under the contract, which is here for interpretation, the plaintiff is entitled to recover if it appears that the defendant in 1911 and 1912 had materially less than 63,000 "paid subscribers." Upon the wording of the contract alone the court might interpret the expression "paid subscribers" to mean those only who had prepaid their subscriptions. The trial court has found that by an established custom of the trade the term "paid subscriber" has a broader meaning, and includes, not only those whose subscriptions had been prepaid, but any subscriber to whom the paper was sent, and who had once paid, although the subscription had not been prepaid for the years in question. This finding is abundantly supported in the record.

First. The purpose of the contract is to advertise the plaintiff's product. The actual circulation of the defendant's magazine was confessedly over 70,000 copies per month, although some of these subscribers had not paid for several years. The magazine was only sent upon the request of the subscriber, renewed in writing each year, upon which the trial court has found that there was legal liability to pay. The purpose of the insertion of the advertisement would therefore seem to be fully accomplished, whether or not the subscriber had in fact paid the subscription price in advance.

Second. The contract itself in effect defines a paid subscriber as one to whom the paper was not sent as a gift. The term "circulation" is therein described as:

"The total number of copies of each issue of the publication above mentioned which shall be published and sold and delivered by the publishers thereof, both to paid subscribers and to news agencies, exclusive of all returns from news agencies and copies given away in any manner whatsoever."

It appears that it was the custom of the different magazines to give away to employés, to advertisers, to advertising agents, to exchanges and for other purposes, what are called "service copies." These would seem to be the part of the circulation that was intended to be excluded by the terms of the contract.

Third. The term "paid subscriber" has been construed by the plaintiff's general manager and secretary, who negotiated and signed the contracts in question. In 1912 E. Mapes, who for the plaintiff negotiated and signed these contracts, was upon the circulation committee of the Association of American Advertisers, which was an association composed of about 70 or 80 prominent advertisers, which at its own expense had audits made of magazines and newspapers to determine the extent of their circulation, for the purpose of ascertaining their value as advertising mediums. Among the papers thus examined by this association were the Knickerbocker Free Press and the Albany Times Union in the city of Albany. In that year a contest arose between those two papers as to which had the larger "paid circulation." This contest was referred to a committee of this association, of which Mr. Mapes was a member. That committee decided that in ascertaining the paid subscription list all those subscribers should be counted who had once paid and to whom the paper was then being sent, although no subscription had in fact been paid for 14 years. The record does not show whether or not Mr. Mapes assented to that decision, but as he was on the committee which made the decision, and it could easily have been shown if he dissented therefrom, it is fair to assume that it was his interpretation, as well as that of the committee, of the term "paid circulation." It is true that this was the interpretation of the term as that applied to the circulation of a newspaper, and not of a magazine. As the audit of a newspaper circulation, however, was for the same purpose as the audit of a magazine circulation, it is difficult to see why the term should have a different meaning when applied to the circulation of a magazine, in a contract for advertising. This interpretation of the term made in 1912 by the man who negotiated and signed this contract for the plaintiff is most cogent, if not controlling, evidence of what was intended in the contract to be included in the term "paid subscriber."

Fourth. The witness Turner is an expert accountant, who for four years before the trial had done nothing except examine the circulation of magazines and newspapers. He had done this work under employment from the plaintiff and other individual advertisers, and also of the Association of American Advertisers before mentioned. Of this association said Mapes is now the president and was then upon the circulation committee. He swears that in making those audits the entire circulation of the paper was divided into two branches, paid

and unpaid; that there was included in the paid class the entire mailing list and the news agencies, and in the unpaid class the advertisers and advertising agents, exchanges, service copies, and employés; that in the class of paid subscribers was included all subscribers to whom the magazine was sent, whether or not payment had been made in advance or the subscriber was in arrears. It is true that few magazines continue to send the paper where the payment of the subscription is far in arrears. That, however, was a matter entirely within the policy of each magazine, and some were more liberal than others, and since 1912 the tendency had been to draw the lines still closer. The plaintiff produced two experts, who made the audits of the defendant's magazine for the year 1911 and 1912, in order to ascertain whether the plaintiff was entitled to any rebate under the contract. This audit was made, however, at the request of the plaintiff, and with a strict construction of the term "paid subscriber" as only those who had paid in advance it was found the circulation was substantially less than 63,000 copies a month. The testimony of plaintiff's main expert, Rink, as to what was understood to be included in the term "paid subscriber" is unsatisfactory and evasive, and in view of the purposes to be accomplished by the contract in question the trial judge was abundantly authorized to find that in the custom of the trade the term "paid subscriber" was not limited to those subscribers who had paid in advance. An examination of the evidence of the two experts called for the plaintiff will be found to contain no substantial dispute of the evidence of Turner, the defendant's expert, as to what was understood to be embraced within the term "paid subscriber" in an audit made for the purpose of determining its value as an advertising medium.

Fifth. It appears that the price of this magazine was normally $1 a year, and that the receipts for the years in question from the subscription list were only between $20,000 and $30,000. This disparity between the circulation and the receipts therefrom undoubtedly casts some suspicion upon the good faith of this circulation. There is no question made, however, that the circulation in fact exceeded 70,000 copies per month. Moreover, while the subscription price was ordinarily $1 a year, it is suggested in the evidence that clubs were formed with a subscription price of 50 cents, so that the actual paid subscriptions were not fairly represented by the actual amount of cash received. It appears from the evidence that other magazines, by offering prizes, send their numbers to many who in fact pay for the magazine much less than the subscription price. Presumably the increased price received from advertisements inserted compensates for loss in the subscription price. These facts were all known to Mapes when he made this contract, and with knowledge of these facts, and of the fact that audits made for the purpose of these associations included in the list of paid subscribers many whose subscriptions were not prepaid, it is a fair inference that, if he had intended to provide only for prepaid subscriptions, he would have used more specific language to that end. There was no finding by the trial court of any bad faith on the part of the defendant in padding its circulation list, *nor was there any request by the plaintiffs so to find.*

The judgment dismissing the complaint must therefore be affirmed.

Judgment affirmed, with costs.  All concur, KELLOGG, J., in result, except

WOODWARD, J. (dissenting).  The plaintiff, engaged in the manufacture and sale of cereal products, is a foreign corporation, and on or about the 27th day of August, 1910, at Minneapolis, Minn., entered into a contract in writing with the defendant to publish in the latter's magazine, known as "American Motherhood," certain advertising matter during the year 1911, at the agreed price of $60 per page, "less 5 per cent. for cash if paid within 10 days from date of publication."  (A like contract was entered into for the year 1912, and these two actions are identical, except that they relate to different years and different sums of money are involved).  The contract provided that the party of the first part would pay the usual commissions to the advertising agents, and other details of the agreement, and that:

"The party of the first part does hereby guarantee that the average circulation of the above-mentioned publication shall not be less than sixty-three thousand (63,000) copies per issue for the time during which the above advertisement shall run, and it is understood and agreed that the term 'circulation,' for the purposes above mentioned, shall be construed as follows:  The total number of copies of each issue of the publication above mentioned which shall be published and sold and delivered by the publishers thereof, both to paid subscribers and to news agencies exclusive of all returns from news agencies and copies given away in any manner whatsoever."

It was then provided that the Cream of Wheat Company should be privileged to audit the books of the defendant, to determine the circulation as thus defined, and that the defendant would rebate its advertising bill in cash in proportion to the failure of the circulation to meet the guaranty, and to pay the cost of such audit in the event that the circulation did not meet the requirements of the contract.  The plaintiff caused audits of the books to be made for the years 1911 and 1912, and as a result of such audits claimed a deficiency in the circulation of about 50 per cent., and demanded performance of the conditions on the part of the defendant.  This was refused, the defendant claiming to have fulfilled its contract, and this action was brought to recover the damages alleged by the plaintiff, resulting in a judgment in favor of the defendant, on the ground that the contract had been fulfilled on the part of the defendant.  The only question at issue on this appeal is the proper construction of the contract—what is meant by the words "paid subscribers"?  The auditors held that it meant the subscriptions paid in advance, or during the term of the contracts, up to the date of the audit; while the defendant contends that it embraces all of the names carried upon its subscription list, some of whom have paid nothing upon account of such subscriptions from the time of the original subscription, running back to the year 1903.

What did the parties agree to?  What was their mutual understanding?  That is the real test, so far as it finds expression in language; and we can get very little help in determining this question from the evidence in reference to the alleged customs of advertisers, if, indeed,

such evidence has any proper place in the case. Obviously, without any extra language, the guaranty of the publishers of "the average circulation" of the publication would be satisfied by showing that a number equal to or exceeding 63,000 was sent out each month, or that the aggregate for the year reached this number for each issue, for circulation does not necessarily require that the publication shall be sold and delivered to individuals. But the parties did not stop with the guaranty of the number to be circulated. They stipulated what should constitute circulation for the purposes of this particular contract, and we have a right to assume that in making a definition they used language calculated to be accurate—language which conveyed the very idea which they intended. Indeed, the contract itself provides how the word "circulation" shall be construed; that is, its very language. It "is understood and agreed that the term 'circulation' for the purposes above mentioned, shall be construed as follows"—and this court has no right to give to the word any other construction than that provided for by the contract. Clearly the word "circulation" was intended to be modified in its meaning. It was not to have any general or uncertain use, and the circulation was the basis of the contract—was the essential consideration for the making of the agreement on the part of the plaintiff. The language clearly indicates that the parties understood that "circulation," as used in the contract, was vague and uncertain; that it did not guarantee any certain amount of publicity of value to the plaintiff in seeking an enlarged market for its product, and for the purpose of making definite and certain what was otherwise indefinite and uncertain, the parties undertook to define "circulation," and it was agreed that the word should be construed to mean "the total number of copies of each issue of the publication above mentioned which shall be published and sold and delivered by the publishers thereof"; and if it had ended here it would not have changed the general meaning of the word, for to publish is "to send forth, as a book, newspaper, musical piece, or other printed work, either for sale or for general distribution" (23 Am. & Eng. Ency. of Law, 459), and a sale and delivery of the papers would have been accomplished when the same had been sent to those who received them with an express or implied promise to pay for the same.

But the contract definition did not end there; the parties had a different purpose to accomplish, in so far as the plaintiff is concerned, at least, and so it was provided further that these magazines "published and sold and delivered by the publisher thereof" should be "both to paid subscribers and to news agencies, exclusive of all returns from news agencies and copies given away in any manner whatsoever." It was not the whole number "published and sold and delivered," but the whole number "published and sold and delivered * * * both to paid subscribers and to news agencies," excluding all copies returned from news agencies, as well as all copies "given away in any manner whatsoever." In other words, "circulation," as used in this contract, was to cover only the papers "published and sold and delivered" to two classes, to "paid subscribers and to news agencies," and no allowances were to be made for returned copies from the news agencies, or for any copies which were given away in any manner whatsoever. This latter

clause had no relation to subscribers; it dealt with the sample copies, with copies which might be delivered to advertisers for their own private distribution, as in the case of Ashton v. Stoy, 96 Iowa, 197, 64 N. W. 804, 30 L. R. A. 584, and with those given out to trainmen, policemen, and others upon the complimentary list, and is not to be confused with the main purpose of the definition of "circulation" for which the plaintiff was contracting.

The learned referee has dealt with the question exactly as he would have been called upon to do in the absence of the definition. He has held, in effect, in so far as this controversy is concerned, that the defendant is to be credited with all of the copies published and sold and delivered, whether to paid subscribers, or to those who are carried upon the books after having once been subscribers though they have never paid but a single subscription, and there is no more than an implied promise to pay. He has completely ignored the definition which the parties themselves agreed should control in the construction of the word "circulation," and has given it exactly the effect which it would have had without the definition; and, if this may be done, there is very little use in people reducing their contracts to writing. There was a distinct object in making this definition. The plaintiff wanted to obtain a circulation among live people, among people who were taking this magazine because they were interested in it—because it had an individuality which appealed to them. ·The intelligent advertiser buys quality in his advertising, as well as quantity, and he has a clear right to stipulate in his contract for any particular quality which he may desire. If the publisher does not have the quality of circulation demanded by the advertiser, then he has no right to contract to deliver it. If he enters into a contract to furnish publicity among a particular class of people, he is bound to furnish such publicity, or respond in damages, upon the broad principle that, where a person by express contract engages absolutely to do an act not impossible or unlawful at the time, neither inevitable accident, nor other unforeseen contingency not within his control, will excuse him, for the reason that he might have provided against them by his contract (Wheeler v. Connecticut Mutual Life Ins. Co., 82 N. Y. 543, 550, 37 Am. Rep. 594, and authorities there cited), and the plaintiff, having carefully provided the rule by which the quality as well as the quantity of circulation was to be determined, should not be deprived of its protection by a construction of the contract which utterly fails to give any force or effect to the rule.

The contract itself, in other parts, uses the word "paid" in its proper sense, and why the word should be given any other sense, or given no sense at all, is not clear. The contract provides that the price of the advertising shall be $60 for each insertion, "less five per cent. for cash if *paid* within ten days," and it is provided that "the party of the first part will *pay* to such advertising agents as are designated by the party of the second part their regular advertising agent's commission," and again that in the event of the circulation being materially less than above stated the defendant will "immediately after said examination make a pro rata rebate to the said Cream of Wheat Company for such shortage in circulation, *paying* said rebate in cash," and finally that, "in consideration of the above agreement, the Cream of Wheat Company

agrees to pay the party of the first part, in *payment* in full for the insertion of the above advertisement," etc.   All of these words from the common root are used in their intelligent grammatical sense, yet it has been held that in that portion of the contract where the parties attempted to formulate a rule to govern in the construction of the word "circulation" the word "paid" is to be understood as referring, not only to those cases in which there has been an actual payment, but to all of those instances in which there is an implied promise to pay, from the fact that the magazine is continued to an original subscriber years ago.

We are clearly of the opinion that the learned referee erred in this construction of the contract, because it fails to give any effect to the provision which assumes to define what circulation is contracted for, and because it ignores the maxim, "Expressio unius est exclusio alterius."   While this maxim will not be permitted to defeat the obvious intent of the parties, where it conflicts with the letter of the contract, such intent must, nevertheless, be discernible in the context of the contract itself.   Aultman & Taylor Co. v. Syme, 163 N. Y. 54, 57, 57 N. E. 168, 79 Am. St. Rep. 565.   Here the context of the contract indicates clearly an intention to make "circulation" mean something more than the mere publication and delivery of a given number of magazines.   It specifically provides that it shall be confined to "paid subscribers and news agencies," and we have no power to change that contract and make it practically ignore the word "paid," which is the active word in the definition attempted by the parties.   "I would wish," says Lord Bacon (IV Lord Bacon's Works, 187), "all readers that expound statutes to do as scholars are willed to do; that is, first to seek out the principal verb; that is, to note and single the material words whereupon the statute is framed; for there are in every statute certain words, which are as veins where the life and blood of the statute cometh, and where all doubts do arise;" and the only word in this contract which makes the latter part of the definition any limitation upon the ordinary use of the word "circulation" as applied to newspapers, and which is "the life and blood of the statute," is the word "paid."   If this is dropped out, then the contract would in effect read that the party of the first part "guarantees that the average circulation of the above-named publication shall not be less than 63,000 copies per issue, excluding all returned copies from news agencies and copies given away in any manner whatsoever."

Obviously this was not the intent of the parties; the contract, fairly read, contemplates the live, paid subscribers to the magazine during the period covered by the contract.   It was the quality of the circulation as well as the quantity which the plaintiff sought to secure, and the letter and the spirit of the contract are violated by including as paid subscribers persons who were not paid up at the beginning or during the life of the contract.   The primary meaning of the word "subscriber" is to write underneath, as one's name; but it also means to give consent to something written, to assent, to agree, and a subscriber is defined to be: (1) One who subscribes; one who contributes to an undertaking by subscribing; (2) one who enters his name for a paper, book, map, or the like.   Web. Int. Dic.   To become a subscriber to a newspaper includes some voluntary act on the part of the subscriber, or something which is in effect an assent by him to the use of his name as a subscrib-

er. A person to whom a newspaper is sent without his knowledge or consent, either expressed or implied, is not a subscriber within the meaning of the statute. Ashton v. Stoy, 96 Iowa, 197, 64 N. W. 804, 30 L. R. A. 584. To become a paid subscriber requires, not only the act of subscribing, but the act of paying; and the defendant's form letter, in which the old subscriber is asked to "please remember that this order will be accepted without any remittance, and payment can be made later," strongly suggests that the so-called circulation of something over 70,000, yielding a revenue of only about $30,000 annually (the subscription price being $1 per year), is not in any proper sense such a paid subscription list as the plaintiff had a right to expect under its contract. "Paid subscribers" are not persons who are legally obligated to pay, but those who have in fact paid; and if the defendant wanted to sell advertising space upon the basis of its general circulation, or to subscribers legally obligated to pay, it was easy to provide for that, but it has no right to specifically provide for one kind of circulation and to substitute another as "just as good," for that is not what the plaintiff purchased. The plaintiff allowed all of the paid subscribers up to the time of its audit in each case, giving the defendant the benefit of any one who had become a paid subscriber during the time under which the parties were operating under the contract, and is entitled to recover in these actions.

The judgment appealed from should be reversed, and the findings of fact should be made to harmonize with this construction of the contract; the plaintiff having judgment for the amount of its claim.

